I want to be sure we get the order right here. Now we've got three different people. Are you Lisa? I'm Rachel Garrard. Oh, I see. Okay, and you're the primary counsel for Anderson, right? That's correct. Very well. And where is Lisa? Is this Lisa? Okay. And Michael is there. Okay, very well. You all can sit down and relax until Ms. Did you say Garrard? Garrard. All right, very well. All right, please proceed, Ms. Garrard. Thank you. Good morning, and may it please the Court, Rachel Garrard appearing on behalf of Robert Anderson and 45 of the other appellants. I am going to try and reserve at least a minute of my time, so I'll be mindful of the clock to ensure that my colleagues can also have their time that we've discussed here today. The government's alleged failure to remediate the toxic waste present at the George Air Force Base is not protected by the discretionary function exception for two primary reasons. The first is that case law explains that while the design of a government program may be protected by the DFE, the implementation of that program is not. And here appellants' claims challenge not the design of the government's multiple remediation programs over the decades, but the failure to implement those programs over the course of 50-plus years. Second, pursuant to this Court's more recent holding in NANUC regarding policy considerations, even if we get to the second prong of the DFE, a general appeal to limited resources and military priorities is not enough in cases like this one involving delay. Those types of policies may assist the government in the initial application of the DFE to certain decisions that were made at the outset of its remediation efforts, but they do not automatically shield the government's actions in perpetuity. Let me ask you this. As I look at it, the complaint doesn't really challenge the use and disposal of hazardous materials. You say that it doesn't, and yet there's a lot of clear language that says otherwise. What's your response to that? The government of the complaint is to challenge the overall inaction, indecisiveness, and indifference of the government to the people being poisoned by the toxic exposure at the Georgia Air Force Base over the course of these decades. So the complaint does include a history of the use and the disposal of these toxins, but more importantly, the history tracks these three or four different occasions over the decades where the government promised to initiate groundwater cleanup and various remediation programs that resulted in essentially nothing being done. So, for example, in 1971, the government agreed to transfer its radioactive waste to an authorized disposal site, and eight years later, a study was done that showed 18 to 20 55-gallon drums of toxic chemicals still buried underground, including things like uranium. Counsel, let me just ask you, I think every one of us as a human being can really empathize with your clients, but we don't produce the law. We have to imply what we've been given. And what troubles me here is that the very thing you're talking about seems to be covered by the DFC. Let me ask you this. Were the individuals that you're talking about here, certainly Ms. Stichenor and Mr. McAuley, were they living at Georgia Air Force Base because they had to live there, or did they choose to live there? People were there voluntarily. Okay. So there was not an order that they be there, right? I think at various times that might have differed throughout the decades, but there were people there voluntarily living there with their families when they had every freedom to be living off base. That's correct. Your briefs don't address Chad versus U.S. What that distinguishes WISNAT. How do you deal with that? So admittedly, WISNAT has some different facts than we have in this case. WISNAT did discuss the distinction between design and implementation, but it dealt with a toxic mold situation as opposed to the magnitude of the toxic exposure that we have in our case. The similarity, though, is that similar to WISNAT, which dealt with a matter of keeping and maintaining a safe and healthy base, what we have is a matter of keeping and maintaining a safe and healthy base where chemicals were created from essentially washing airplanes, and the government failed to appropriately take out the trash. The appellant's main complaint is not that the government didn't do precisely this or precisely that with respect to any of the chemicals or any of the programs. It's only that over the course of 50 years, nothing has been meaningfully accomplished. In Nanook, for example, the delay in that case was but 13 years, and this Court still said as recent as, I believe, 2020, that the government is still responsible for meeting its burden in establishing that the DFE applies and that it cannot simply conflate policy reasoning with respect to decisions made at the outside of a program with all subsequent delays in perpetuity. And so here we have a delay that's nearly five times as long, and indeed we're being told that remediation efforts are going to be continuing on until, I believe, 2077. So that's another 50 years. People are living there now. Civilians are living there now. There's a school on the base, and there are no warning signs. And so I think the gravamen of the complaint is what needs to be kept in mind because we are dealing with a motion to dismiss. Nanook was decided after a motion for summary judgment, after discovery had been entirely completed in the case. Same with atmospheric testing and several of the other cases that are alluded to by the parties in their briefing. And so the distinction here, too, is that this case has just begun, that to the extent the allegations in the complaint are not sufficient to meet any of these standards set forth in the law, that at the very least appellants should be afforded the opportunity to amend. This was the very first motion to dismiss, and it was granted with prejudice. What's your best case to get around DFE and allow you to amend? I think this Court could easily look to several cases, including Nanook and Turbush, for example. In both cases, this Court said that it didn't have sufficient information to establish that the government was entitled to the DFE as a matter of law. In Turbush in particular, the Court explained that the government in that case had lumped together the question of maintenance with the other claims of design and construction, and so the Court could not determine what exactly the government was claiming. And I think the same is true in this case with respect to the government's policy reasons. And if we reversed and sent it back to district courts, said let these folks have a chance to amend, what would you do, how would you plead differently than what you did the first time? Especially if the parties were permitted to jurisdictional discovery, for example, Your Honor, we would have the opportunity to amplify the pleadings significantly with respect to what precisely was implemented in the program and what was not. And this is not just the singular program in 1971, but the subsequent programs in 1980, 1986, and 1990. So this is truly over the course of decades of the program agreeing over and over and over again to eliminate toxic plumes that are contaminating upper aquifers, groundwater, soil, over a mile long and almost a mile wide. We're talking about contamination levels of 560 parts per billion when the California limitation is 5 ppb. And so – I don't want to save any of your time. It's up to you. Yes, Your Honor. I would like to reserve a couple of minutes to rebut. Okay. Okay. Thank you very much. All right. Now, do you folks want to go now or do you want to go after you hear from them? Whichever you want to do, we'll do. Want to go now? Yes, sir. Very well. Get the microphone closer to you because I'm having a hard time understanding what you're saying. Is it Ticanora? Is that correct? Yes. Please proceed. You've got five minutes. Good morning. Good morning. I just wanted to thank the Court for allowing me the opportunity to give oral arguments today. I spent many hours trying to think of a way to convey to the Court just how important your decision is today. Many lives hang in the balance. The discretionary function exception can easily be misused and abused by government agencies to avoid accountability for their actions. It allows agencies to claim immunity from lawsuits simply by arguing that their actions are based on discretion without being required to show that their actions were reasonable or within the scope of their authority. This exception can create a lack of transparency and oversight as government agencies may feel less inclined to justify their decisions or provide explanations for their actions. If they know that they can simply fall back on it. Furthermore, this exemption can lead to injustice for individuals who have been harmed by the actions of the government agencies. It can prevent them from seeking justice or compensation for their injuries, even when those injuries are the result of negligence or misconduct, such as in the case of George Air Force Base. You know, the Air Force has rules for everything, absolutely everything. There's nothing left to discretion. There's no gray area. It's black and white. The guys won't even fix something on one of the jets without consulting the Air Force way, their manual first. Everything is done a certain way. They tell them, you know, how to clean the bathrooms, care for their feet, instructions on uniforms, when to wake up, when to go to bed, when to eat, what to eat. They have rules for everything, and that includes toxic waste. And they know by their actions, for whatever reason they did it, they were just dumping it on the ground. If you read in the reports, you see that there's, you know, people who witnessed them dumping these chemicals on Perimeter Road. Perimeter Road circles the heart of the base and goes through the housing area. They were having rollover accidents, the police were, from driving through these puddles. The fumes would hit them. And, you know, they were also using it, trichloroethylene for weed control. A 640-acre plume, I mean, it's hard to wrap your mind around a plume that big, but a 640-acre plume of trichloroethylene in the heart of the base. It's affecting everyone. There was two feet of jet fuel on top of our water table. The Air Force knew this for many, many, many years. We found reports dating back to the 60s acknowledging the problem, saying, you know, laying out a plan, how they're going to correct it, what they're going to do differently. And they never implemented any of it. And, you know, there's just no, with these rules and regulations, there's no leeway. If you don't follow them, you get legal action. You get brought up before your commander. You can get a court-martial. It's very serious. So, you know, to say that they have the right to suddenly, you know, to apply this to every case is wrong. Because, you know, there's more than just the military rules. Beyond that, there's the EPA. And in May 19, 1980, they sought the Air Force's advice. The EPA did when they were doing, it's in the Federal Register, when they were doing the sweeping changes. I apologize. Your five minutes is up. Could you just wrap up very quickly what you want to say, please? That they, you know, they sought their advice. The EPA did. It's in the Federal Register dated May 19, 1980. Because they had explosive ordnance, dangerous waste, and the Air Force already had plans in place for proper disposal. They can't afford to get the troops sick. Okay? But at our base, you know, a lot of people were sent there because it was a punishment base is what I was told. Thank you very much for your argument, Ms. Tissonora. Now, Mr. McCauley, please proceed. Also, you have five minutes. Thank you. Ladies and gentlemen of the court, today I bring forth a matter that strikes the very core of justice and accountability. This case challenges the dismissive stance taken by the district court and sheds light on the erogeous violations of EPA federal regulations, specifically CERCLA and FFRA. The government cannot simply invoke the discretionary function exception to escape accountability when they knowingly disregarded regulations designed to protect lives and the environment. I'd like to point out that I never was given an option. I was told to go to school there. I was a private civilian. I had no relation to the Air Base. And I actually even had a teacher that took us under the fence one day, and he ended up getting caught by the MPs who showed up, and they tried to get him to sign a confidentiality agreement. He ended up quitting that day. And he warned me about that when he left, and so I left shortly after that. The district's courts are dismissed with prejudice, citing the discretionary function exception stands in stark contradictions to the deliberate actions by the government. This case underscores the government's conscious violations to establish guidelines and regulations meant to safeguard the health and well-being of individuals residing near or on the contaminated base. A critical point of contention is the flagrant violation of land restriction deeds, explicitly prohibiting schools to be operating inside the contamination zone. The violation is not an oversight to deliberate act endangering countless lives, especially students. The contamination around the school is not a distant threat. It is an immediate danger, lying just an inch below topsoil. Moreover, all digging in the soil is restricted due to the contamination, direct response to the tangible risks posed by the contaminants. Adding severity to this situation is the base posting warning signs that is inaccurately representing the actual chemicals found in the water and soil. The signs mention lead, paint, asbestos, and pesticides, yet omit benzene and dildrin, which are equally hazardous and present in the ground soil. By highlighting the fraction of the dangerous chemicals, these signs mislead the downplay the true risks to the community. By allowing schools to operate in such a compromised environment, the misrepresentation of the hazards the government exhibits profound disregard for established safety protocols and public transparency. The surrounding housing area has been tested and found to be contaminating both water and soil and revealing the pervasive nature of the pollution. Mr. McCauley, I know you're probably not a lawyer, right? No. So let me just explain one little thing that might help you deal with what we're dealing with here. If this were a private company, you'd have a dead-bang winner, absolutely no problem. But in our system of government, the United States has what's called sovereign immunity, which means that unless it gives express permission for people to sue it for what it does, you can't get relief. So the question that we deal with here is, given the rules, the DFE, of course, you're aware of that, and others, is there enough of an exception available that has been adequately pled to let you get some relief? That's what we're really dealing with. You have able counsel that's trying to help you with that, but that's what we're dealing with. If we were dealing with a private company, hey, you're good. But that's what we struggle with. It's not that you don't have a just claim in the sense that it's something that really needs to be taken care of. But the question is whether it can be done through a lawsuit, whether you can get relief from Congress. They move swiftly, you know. But that's what we're dealing with. I just wanted to explain that to you. A question. Would the Fifth Amendment's Due Process Clause protect against deprivations of life, liberty, and property without due process of law? Failing to inform individuals about the health risks and contaminated base violates the right, denying them the opportunity to make informed decisions about their well-being. The explicit right to a safe and healthy environment, although not explicitly stated, aligns with the Constitution's protection of life, liberty, and property. The government's failure to disclose contamination infringes upon this implicit right. Furthermore, violating citizens' constitutional protections. In conclusion, the case demands acknowledgement and justice. Breaches of regulations, constitutional rights, and legal precedents cannot go unaddressed. We seek accountability and redress for the harm caused by the contamination at Georgia Air Force Base. A pivotal moment for the court to stand up for the rights and well-being of citizens. Yeah, I mean. Well, your time is up. And we're grateful to hear from both of you. We appreciate it. Thank you. So your counsel will have another chance for a brief rebuttal, but let's now hear from the government. May it please the Court. Waley Shaw for the United States. On appeal, plaintiffs now say that the government conduct they are challenging is a failure to maintain safe premises, which appears to be another way of saying a failure to remediate. Now, even if that theory is not forfeited, that argument only reinforces how the challenged actions are susceptible to policy analysis. I'm having difficulty understanding you because when you make your point, you look down and you speak down instead of speaking up. Sure. I apologize. So the current state of remediation on Georgia Air Force Base, or perhaps more relevantly, the state of remediation at the time that the plaintiffs lived on the base, which ended, I think, in the early 1990s, is the product of innumerable policy-driven decisions about how to conduct a massive, decades-long cleanup effort. Now, the complaint itself alleges that the government developed a series of programs and plans, both involving the Air Force itself and also in consultation with the EPA and the State of California, about how to conduct, about how to identify the hazardous waste on the base and then to conduct that remediation. So far as we can tell from the complaint, those plans and programs are, in fact, being carried out, and the government continues to implement them and adjust them as necessary. So the state of remediation as of the early 1990s, which is when the base closed and plaintiffs moved away, is the product of those decisions. Now, the point of the discretionary function exception is that the judiciary should not be second-guessing these kinds of policy-driven choices through the medium of tort actions. You do agree that if the reason for the delay in the cleanup is simply budgetary and not part of a policy analysis, right, then that would be not within the discretionary exception, right? I think if there was no competing policy consideration for not conducting the cleanup, then WISNET might apply, but that's simply not the case here. There are an incredible number of complex. You know that from the complaint itself. In Paragraph 79, the complaint alleges that there was a cleanup that hasn't been finished and is going to continue until 2077. Right. And then immediately after that, in Paragraph 80, it incorporates 1 through 79, and Paragraph 87, the allegation is made that you, the government, failed to use reasonable care in finishing the cleanup. Now, it may turn out that in discovery and in proof, the cleanup itself involves some policy analysis because of the But as we look at the complaint now, why isn't negligent failure to clean up by accomplishing an adopted plan, already adopted, not sufficient allegation of breach of duty? So I have multiple responses to that. First, I would point out that the paragraphs that you're on are identified in the complaint are simply with no specific factual support in that. Paragraph 79 alleges that you have a cleanup plan and it's going to continue until 2077. Right. And then 87 says you've been dilatory and you've been unreasonable in not finishing the cleanup plan. Why isn't that a sufficient allegation that involves not any discretionary analysis, but just simply lack of diligence? A simple assertion that the government has been unreasonable and has not exercised due care is simply a recital of the elements and the cause of action within the meaning of Iqbal and Twombly, and it's not entitled to the presumption of truth. And I would just point out the actual- But they allege that there's a breach of duty by failing to dispose. Dispose means get rid of, right? That is part of the cleanup plan. Right, again- Again, that is simply a conclusory allegation, and there are no specific factual allegations in the complaint that permit an inference that the government has not actually been executing the cleanup plans that it has developed. Would you agree with Ms. Garrard that they have a chance to amend to allege some specific allegations of breach? I mean, I don't think that amendment is either appropriate or would be helpful in this case because, again, what we have here is a case in which the government, in consultation between multiple agencies, has developed plans and programs for identifying hazardous waste and for remediating them, and it is continuing to carry out those plans. So the product, the state of conditions- Perhaps you didn't hear what my colleague said. He said that you have an existing plan, so any discretion has already been involved. You've got a plan, but you're not performing the plan. You say they're just conclusory allegations. And he asked, well, why shouldn't we then send it back, give these folks an opportunity to amend their complaint, to flesh out what you think is conclusory, and see where it goes? Well, so let me make two responses, just first on the specific amendment point, and then let me turn to the legal question. So on the amendment point, this is plaintiffs have already amended their complaint twice. This is now their third complaint. Before the motion to dismiss proceedings in the district court, the government offered at a conference, the government identified the deficiencies in the complaint and offered to give plaintiffs an opportunity to amend their complaint to address those deficiencies. The plaintiffs declined. The plaintiffs have never moved to amend their complaint. Instead, what they've done is they've sort of shifted their theory of liability between the district — between the complaint, the district court proceedings, and now. So it's gone from, you know, use and disposal claims to failure to warn claims, and now it seems to be failure to remediate. So plaintiffs have had multiple bites at the apple, and there is no reason to allow them yet another bite to file a fourth complaint. So you're saying this is the third amended complaint we're dealing with now? Well, this is the third — the second amended complaint. So the third complaint in total. But it's the third complaint. Right. The next — You're saying that the district court gave them an opportunity to amend the complaint, and they said no. Well, no. There was a conference, a required conference between the parties prior to the motion to dismiss proceedings. And at that point, the government identified the deficiencies in the complaint and offered to give the plaintiffs a time to amend their complaint to address those deficiencies. The government did, but this was not before the district court? Yeah. This was — right. This was sort of between the parties, and it was a fact that was pointed out to the district court in briefing and is in the record. But more generally, I would just — going to the question of, you know, is this simply implementing a plan and does that take it out of the discretionary function exception, that's absolutely not a correct reading of even WISNAT or this Court's discretionary function cases more generally or of the Supreme Court's cases in this area. So even WISNAT itself recognized that — I think this was in footnote 3 — that implementation can be covered by the discretionary function exception if that implementation is susceptible to policy concerns. And this Court and the Supreme Court have a series of cases that illustrate this proposition. So, for example, in the Lamb case, this Court held that the discretionary function applied to failure to remove a particular tree in implementing a tree management plan. In Chad, it was failure to remove a mountain goat in implementing an animal management plan. In Varig, the — With respect, those were little teeny things in the whole thing. If I understand correctly, what's being alleged here is that this is a big plan, a massive plan, and whole sections of it are just not being done. That's simply not an allegation in the complaint. There's no allegation in the complaint that there are sections of the plan that are not being performed. So while — so far as is evident from the complaint, the plan is being carried out. It's just that the plan takes an incredibly long time, and there is a very good reason for that. The reason — and I don't actually know if the State is correct, but the reason, I presume, that the 27 — 2077 date has — I'm sorry, the 2077 date has been offered is because what plaintiffs are talking about is a massive cleanup effort. They are alleging that over the course of half a century, there have been dozens of chemicals deposited on this base, a base that covers 5,000-plus acres. And much of it, or at least some of it, apparently, is deep underground in aquifers and in soil. So the idea that the government could simply snap its fingers and say, oh, today we're going to clean this up, and we'll, you know, we'll spend, you know, however much money, that they could just remove it immediately is simply not false. We are talking about a massive — Let me add to that. Not as a matter of fact, but just arguendo. Let's just say that the plan calls for the remediation of a particular type of hazardous waste in a particular time framework, and nothing — again, hypothetically, nothing was done in that area during the time period. Would they then pop up a potential cause of action, notwithstanding the discretionary function exception? If — I think that there's at least potentially a NANUC-type claim there, and I don't want to sort of, you know, opine without knowing that — right. But I think you're right. I think Your Honor's referring to an idea where there's a decision to conduct remediation, and then the government simply sits on its hands and doesn't do anything to carry out that policy decision. But again, that is not — there's no — the complaint doesn't evidence this kind of conduct at all. But if they had an opportunity to amend and allege such a thing, if they had anything to back it up, would that not potentially fly at the pleading stage? Well, I don't think it would be possible for them to make that sort of complaint. But I would — ultimately, even I would just challenge the Court and say that even to the extent that we're talking about implementation decisions, right, how the government actually implements specific parts of the remediation plan, that continues to be covered by the discretionary function exception. So there is just no — and that implementation is susceptible to the same kinds of policy concerns that drive the broader plan more generally. And so the idea that plaintiffs can plead around the discretionary function exception is simply not viable. I would — From the government's perspective, DFE covers all aspects of implementation. If they don't do it right, they're still covered. Is that your —  Now, the problem that we have — The policy concerns include lack of money? I think some of this Court's cases suggest that the pure budgetary concern wouldn't — a pure cost concern, for example, the cost of removing the mold from the commissary in Wisnant is not sufficient. But I think this is not remotely that kind of case. Because it's — money is — it seems odd to me that money is not also a policy concern because you have to — it's what Congress does or fails to do, I guess, is decide how — what it's going to spend its money on. And that — if those weren't policy concerns, they could give that job to us as judges, right? But like — so those are pure policies. My understanding was that for some reason our case law  Right. But I don't know that we've said that that can't be along with other policy concerns. Yeah. Thank you for clarifying, Your Honor. Yes. And I think that that is how the Court has characterized — Let me take you back to some of the questions you've got. So, you know, if the government's not acting, I think, I guess, if you could show that the government wasn't acting solely because of money, then it sounds like it would implicate some of these — just basically the exception that says policy concerns related to money don't count in our case law. But I don't know that the questions before were real clear about why the government wasn't acting. I mean, there's various reasons why the government wouldn't act, I suppose, in a cleanup, especially when you're talking about this many chemicals. In theory, you've got a plan and it says you're going to clean up this one site. But then you discover when you get out there that when you clean up this one site, you're now cross-contaminating with this other thing. And so now, oh, no, we have to put that on hold. If it was a situation like that, so you were having to put it on hold because you have to figure out what to do, would that be something that would get around the discretionary function? Yeah. I think that is exactly the kind of implementation decision that is covered by the discretionary function exception. Given the massive extent of the contamination here, in my own background and having done cleanup efforts before I went to the dark side and became an attorney, like, you would run into that quite a bit. I think that's exactly right. I mean, I think the massive scale of the remediation effort here actually further illustrates why this cleanup effort must be susceptible to policy concerns because this is not the case where you simply send someone in to clean up the mold. Let me ask you a question from a pure pleading perspective, so putting aside the fact that there's already been several complaints, so maybe. But how would we know? I mean, my intuition would be, and maybe it's different than my colleagues, but my intuition based on my experience is that if there was a delay, it would be very difficult to pinpoint. I suppose you could plead they've delayed and their delay is solely because of money, and if they said that, would we just need to accept that? Or what do we do with that? Because my intuition would be that probably isn't. If it's the government, it's a variety of things. Right, because ultimately the question is not what the government in fact considered, but whether the type of decision that's at issue and whether it's susceptible to policy concerns. So in some ways it's not what the real reason was, but you say, well, even if it is because of money, if they could be delaying it because of policy concerns, then the discretionary exception would be. Right. And here there's not even an allegation of delay. But let me try to identify some of the policy concerns, if we're talking about remediation, that apply here. And so that take this out of the sort of wiznant category of cases where there simply is no policy reason not to act. So, for example, during the time that plaintiffs lived on the base, this was an active military base supporting operations around the world. And so any remediation efforts obviously would have to be balanced against the military national security needs of the Air Force in conducting operations on the base. And then, Your Honor, you mentioned the example of cleanup, sort of considerations in cleanup. So Plaintiff Bondi alleges in her brief that some of the cleanup efforts, in fact, led to further spread of the contamination. So the government would have to balance the need to take the chemicals out now with the sort of a countervailing safety risk of spreading this chemical spread. That would be a reasonable basis to avoid a negligence charge. No, but it's also they are competing. But is that exactly what the plaintiff is saying? There's no reason at all why you haven't cleaned up. No, that is a safety consideration, a policy concern that has to be weighed in making decisions about how to conduct implementation. So if I can choose option A for remediation, and I'll take more chemicals out now, but it's going to cause the plume to spread more widely, I have to weigh those competing safety concerns against an option that takes the sort of chemicals out more thoroughly. I think maybe you're misunderstanding it. I think Judge Bea may be saying, yes, but they pled that it was unreasonable. So by pleading it was unreasonable, they've sort of pushed all that stuff off the table that the government could have. But I guess your answer to that would be, pleading can't get around the fact that if it's susceptible. I mean, you're leaning heavily on the fact that it doesn't matter why we actually did it. It matters sort of in this abstract world. Would it be susceptible to a policy? That's exactly right. And there are many cases, both of the Supreme Court and of this court, that say that, for example, the Gonzales case where this court said the government need not prove that any decision actually involved the weighing of policy considerations. The question, again, is susceptibility to policy analysis. And then just to wrap up on sort of the policy concerns. So, you know, we have decisions about balancing the military needs for operations on the base. We have sort of competing safety concerns about how to implement the remediation. We have prioritization questions, which this court expressly held and I know are covered by the discretionary function exemption. So both decisions about how to prioritize across different bases, and then within this 5,000-plus acre base, how to prioritize sites within the base, what chemicals to prioritize, and what locations to prioritize. So these are all. If, arguendo, we were to agree that the complaint fails to allege a breach of a duty to clean up or remediate under the cleanup order, given the complexity involved here, given the number of orders involved, what objection would the government have to allowing these folks to go back, take another shot at amending the complaint, do some discovery about some of these issues? It's an important issue for them. The government, this is kind of an ongoing thing. What objection would you have to that? I think amendment would be futile because plaintiffs can't plead around the fact that the decisions they're talking about are susceptible to policy analysis. They've further had many opportunities to amend, but they haven't taken advantage of those opportunities. Suppose they plead a condition which is not susceptible to a policy analysis, and you're not able to get a declaration from an expert witness that it is subject to a policy analysis, then there would be a tribal issue of fact on summary judgment motion, wouldn't there? I don't think so. I mean, I think what Galbert says, that it is the plaintiff's, Galbert expressly says that it is the plaintiff's burden to, I'm sorry, let me, I want to give you the exact language here. It says that. The plaintiff's burden to plead out of the discretionary analysis? Yes. It says, Galbert says that for a complaint to survive a motion to dismiss, it must allege facts which would support a finding that the challenged actions are not the kind of conduct that can be said to be grounded in the policy of the regulatory regime. So plaintiffs cannot both ignore Iqbal and Twombly and then get around the discretionary function purely by virtue of being extraordinarily broad in general in their allegations. And alleged what they needed to to get past the first step. Any reason why the government would object to that? Yeah, I think, again, both the futility of the amendment because of the susceptibility of the decisions to policy analysis and also the fact that the plaintiffs have had repeated opportunities to amend but have declined to do so. Let me ask my colleagues, does either have additional questions? What was the name of that case you were citing from? Oh, that was Galbert. Galbert, the Supreme Court's decision in Galbert, which is United States v. Galbert, 499 U.S. 315. Very well. Thank you very much. Thank you very much. We have a little bit of rebuttal time then. Ms. Gerard? If you accept what Mr. Shaw said as the duty of the plaintiff to plead out of the discretionary exception, do you have a good-faith belief that you can plead those facts? Yes, Your Honor. Absolutely. First, the pleading standard articulates that the complaint must be read in the light most favorable to appellants and that all well-pleaded factual allegations must be deemed true at the pleading stage. Detailed factual allegations are actually not required under the law. Well, you disagree with him then? I disagree. Okay. I asked you. Supposing we agree with him, do you think you have a good-faith basis of alleging specific facts which make out that the actions or omissions of the government are outside of the discretionary exception? Understood. I do, Your Honor, and that's because we're able to return to the district court and engage in jurisdictional discovery. The complaint is that we don't have specific enough allegations regarding the designs of the programs, but how can we allege the design of the program and the failure to implement in an appropriate fashion if we've not been entitled to discovery on those points? Do you think with discovery you'd be able to discover those facts? Absolutely. All right. Let me think about it, because as I'm sitting here thinking about what you could possibly allege, it seems like there's two options you could have to kind of get around in this context. One would be the smoking gun document in the government's possession that you get that says, you know, the only thing we're relying on here is lack of money, right? And, you know, we are not making any other policy decisions other than lack of money. I suppose if you got that document, then that would fall within our cases that say that monetary-based policy exception, policy rationales don't matter. The other basis, I suppose, would be if you found out that the government had a plan. I don't think you're going to get the first one, so I'm just saying in theory. But if you found out that the government had a plan that left nothing to discretion, right? That's kind of what it feels like you would need, like whatever the government's remedial plan. And maybe it's because my own past, you know, I used to do cleanup construction work before. But the idea that you could even, that there is even like conceptually the idea that there could be a cleanup plan that doesn't leave anything to discretion, especially for a, unfortunately for you all, it's the size, the size of this thing actually works against you. Because if it was one tree, it sounds like, no, no, this rule demands this tree be removed. So how, you say, I understand your answer is that, no, we could definitely plead out of the discretionary function. But I'm having trouble thinking that you would get a plan, or actually I'm guessing it's a pile of plans, right, for all the different, and that those plans would leave no discretion, no policy. So what is your answer to that? Because I'm struggling with that. So two responses to that. First is I take issue with the government's interpretation of the design versus implementation utilization of the DFE. So case after case has said, look, the DFE is, it's vague, it's a little bit difficult to apply. And so this is what we're going to do. We're going to move it into these two categories. If you're challenging the design, it's protected. If you're challenging the implementation, it's not protected. Counsel on the other side points to DICTA in one case saying, yeah, but if there's policy considerations, maybe it can still be protected. But that's not what that case hinged upon, and there's no other cases to support it. It also seems intuitive to me that cleanup plans, even the plan itself, so you're saying we wouldn't be challenging the implementation. We'd be challenging the design of the plan. But it seems to me that the design of cleanup plans for something like this, how could they not be full of lots of policy decisions? You know, we need to wait to clean this up until we clean that other thing up, because if we do that, we think that it could cause this problem over here. To clarify. But you think any policy decisions? Make sure I understand your position. You think any policy decisions that go into and get memorialized within the plan, now those policy decisions don't count anymore for purposes of the discretionary? No. So let me clarify. I'm not saying that we are trying to move the case into a challenge to the design. I'm saying that case law over the decades has divided these two categories of cases and said the design is protected, the implementation is not, and that appellants are challenging the implementation. And I disagree that appellants would need to find any singular smoking gun document. Instead, for example, if we are permitted to amend the complaint or to engage in jurisdictional discovery, for example, in the ordinary litigation process, what we might find is the details of these programs are not being implemented whatsoever. And so the government can list a couple of policy reasons. Wouldn't it also require that if the reason they're not being implemented has to be monetary, basically, because if it's some other policy reason they're not being implemented, because they're waiting on something else, that doesn't help you, does it? So cases over the decades have not held the implementation cases to the same standard of being discarded just because they've been in the face of policy, if that makes sense. So you don't think policy considerations apply at all to implement? It turns out like there's 47 different policy things that need to be taken into account in actually implementing the plan. So it's all on the implementation. You don't think that matters that you can still just say implementate? At the motion to dismiss phase, that's correct. I think that the cases have been divided and that there's a singular case, Galbert, that meanders into this category of, well, but what if there's a lot of really good policy reasons and perhaps that could be explored further in further litigation, but ultimately what we're dealing with here is this massive scale that you were alluding to earlier. What if the government had done what it was supposed to do in the 1970s? Would we be facing the same challenge here? Would we be facing the same 65-acre, 600-acre TCE plume that we have now? And maybe what we are going to discover in the jurisdictional discovery and back in the district court is that multiple designs from the 70s, from the 80s, from the 90s, multiple programs that were designed in a specific fashion were not being implemented. The government says otherwise, but we've not yet been permitted the opportunity to challenge that. You're way over your time, but let me just say that anybody that is in a government building that deals with the GSA can understand your issue. There may or may not be money, but they may or may not get it done. I would just briefly conclude then, Your Honor, that the 13-year delay in NANUC where there was ample evidence following the close of discovery that actions had been taken, it just hadn't been completed for 13 years, even that the court said was not supported by policy in that case. And I think the delay here of 50 and potentially going on 100 years of cleanup is sufficient to raise eyebrows and at least permit the appellants the opportunity to proceed further into the litigation. Questions about my colleague? I'm sure we could talk forever, but we thank you all. Thank you, especially you folks who are here on a very personal basis. The case just argued is submitted.
judges: BEA, SMITH, VANDYKE